2005 UT 70

STATE of Utah, Plaintiff and Petitioner,

v.

Miguel Angel LARA, Defendant and Respondent.

No. 20030939.

Supreme Court of Utah.

Nov. 4, 2005.

---

Mark L. Shurtleff, Att'y Gen., Laura B. Dupaix, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Joan C. Watt, John D. O'Connell, Jr., Salt Lake City, for defendant.

NEHRING, Justice:

¶ 1 We granted certiorari in this matter to determine whether the court of appeals had the authority to reinstate Mr. Lara's appeal after it had dismissed his prior appeal and issued a remittitur. We hold that it did and affirm.

## BACKGROUND

¶ 2 Mr. Lara, a sixteen-year-old, was charged with aggravated robbery under the Serious Youth Offender Act ("SYOA"). Utah Code Ann. § 78–3a–602 (1996). The SYOA allows a juvenile to be bound over and charged as an adult in the district court for serious charges unless the juvenile can satisfy certain conditions, commonly known as "retention factors," which would require the juvenile court to retain jurisdiction. The juvenile court found that these conditions were not met and thus bound over Mr. Lara.

¶ 3 Mr. Lara asked the district court to quash the bindover, challenging the juvenile court's ruling that he had not met the retention factors. The State argued that as a final and appealable order, the only proper venue to challenge the bindover was the court of appeals. However, the district court judge indicated that she had jurisdiction to address the motion to quash and suggested that she disagreed with the juvenile court's decision to bindover Mr. Lara. However, the judge felt she could not address the motion to quash so long as the appeal was pending in the court of appeals, and indicated that Mr. Lara should withdraw his appeal to the court of appeals if he wished for her to rule on his motion.

¶ 4 On February 14, 2001, Mr. Lara filed a motion with the court of appeals to voluntarily dismiss his appeal. As required by Utah Rule of Appellate Procedure 37(b), the motion to dismiss was accompanied by Mr. Lara's affidavit stating the following:

(1) I am the Defendant in the above case, (2) It is my desire to withdraw my appeal at this time, (3) I am aware that I have the right to appeal my conviction and sentence to the Utah Court of Appeals; however, I do not wish to pursue this appeal, (4) I understand that once this appeal is withdrawn, it cannot be reinstated, (5) It is my desire to waive any and all rights to the appeal docketed in this case, (6) I am doing this knowingly and voluntarily and have not been threatened or otherwise induced in any way to withdraw this appeal, and (7) I have consulted with my attorney with respect to this withdrawal and feel that it will not benefit me to pursue this appeal.

¶ 5 On March 6, 2001, the district court judge issued a memorandum decision in which she ruled that she did not have jurisdiction to review the bindover order and that

Mr. Lara's only option was to seek appellate review of the order. Because Mr. Lara had withdrawn his appeal, the trial court's decision also stated that Mr. Lara's appeal was reinstated. Mr. Lara did not, however, file a motion with the court of appeals to reinstate his appeal nor did he seek to withdraw his motion to dismiss it. Eventually, Mr. Lara pled guilty in the district court to second degree felony theft on the condition that he be permitted to challenge the juvenile court's bindover order on appeal.

¶ 6 When Mr. Lara filed his appeal, the State claimed that the court of appeals did not have jurisdiction to hear the case because once the juvenile court binds over a case to district court, an appellate court has no jurisdiction to hear the challenge unless that order is timely appealed. Additionally, the State claimed that remittitur issued after Mr. Lara's voluntary withdrawal of his appeal to the court of appeals, and that following remittitur the court of appeals lacked jurisdiction to reinstate the appeal. The court of appeals rejected these arguments. It concluded that Mr. Lara had not knowingly and voluntarily withdrawn his appeal due to the district court's misleading assurances of the retention of some right to appeal. After reinstating the appeal, the court reversed the juvenile court's bindover order, finding that Mr. Lara had met the required retention factors.

¶ 7 The State petitioned for writ of certiorari. We granted certiorari to determine whether the court of appeals had authority to reinstate Mr. Lara's appeal after it had dismissed his earlier appeal and issued a remittitur.

## ANALYSIS

¶ 8 To invoke appellate jurisdiction after an appeal has been dismissed a party must establish the existence of two components: jurisdictional authority and a procedure to access it. Mr. Lara claims a constitutional basis for reclaiming appellate jurisdiction, based on his constitutionally protected right to appeal guaranteed to criminal defendants in Utah's Declaration of Rights. Utah Const. art. I, § 12. He asserts that this constitutional right would be infringed if he were denied the right to appeal that he believed he preserved when he entered his plea. To complement this claimed source of jurisdiction, Mr. Lara offered three procedural alternatives to open the door to the court of appeals: (1) reinstatement of his direct appeal from the juvenile court bindover order, (2) review of the district court's ruling that it had jurisdiction over Mr. Lara, or (3) consideration of Mr. Lara's request for extraordinary relief. The first two of these alternatives sought access to the court of appeals' appellate jurisdiction. In contrast, had the court of appeals exercised its writ power in aid of Mr. Lara it would have done so within the scope of its original jurisdiction. *Gates v. Taylor*, 2000 UT 33, ¶ 3, 997 P.2d 903. The court of appeals elected to accept Mr. Lara's first option and reinstated his appeal.

¶ 9 The State contends that when the court of appeals issued a remittitur following its dismissal of Mr. Lara's appeal, it surrendered its jurisdiction. Because it had no jurisdiction to reinstate Mr. Lara's appeal, the court of appeals had no authority to review the propriety of his bindover to district court under the SYOA. In our view, these assertions misapprehend the scope of appellate court jurisdiction and improperly inflate the significance of remittitur as a limitation on that jurisdiction.

¶ 10 At the outset we acknowledge the fundamental logical truth that forms the conceptual foundation for the assertion that remittitur strips the appellate court of jurisdiction. Appellate courts do not enjoy unlimited power to review the actions of trial courts and administrative agencies. The scope of appellate court authority is bounded by constitutional and statutory grants of jurisdiction and by court rules that give practical procedural effect to the jurisdiction conferred by our Constitution and legislative branch. Appellate courts cannot conjure jurisdiction. Thus, when the original or appellate jurisdiction of an appellate court is properly accessed and the court completes its exercise of authority over a matter brought before it, logic would suggest that the court relinquishes its hold on jurisdiction

and cannot regain it without the aid of a satisfactory legal basis to do so.

¶ 11 Many of our cases reinforce our commitment to honoring the limitations of appellate jurisdiction. Under the holdings in these cases, we have characterized as "jurisdictional" in nature attempts to access appellate courts without an adequate constitutional or statutory justification and turned them away. For example, we have designated as "jurisdictional" failures to file notices of appeal within the allotted time, *see, e.g., State v. Putnik*, 2002 UT 122, 63 P.3d 91; *Utah Dep't of Bus. Regulation, Div. of Pub. Utils. v. Pub. Serv. Comm'n*, 602 P.2d 696 (Utah 1979), and attempts to obtain appellate review of non-final orders. *See, e.g., Loffredo v. Holt*, 2001 UT 97, 37 P.3d 1070; *Union Pac. R.R. Co. v. Utah State Tax Comm'n*, 2000 UT 40, 999 P.2d 17.

¶ 12 In these cases the term "jurisdiction" is not intended in every instance to mean that the issue before the appellate court concerned a potential trespass into jurisdictional turf outside that allotted by our Constitution or statute. For example, when we turn away an untimely filed appeal on the grounds that we do not have jurisdiction to entertain it, we are granting "jurisdictional" effect to our own rules of procedure. Utah R.App. P. 4.

¶ 13 Similarly, remittitur is a procedure created pursuant to the rule making authority vested in this court. Utah Code Ann. § 78-2-4 (1986). Rule 36 of the Utah Rules of Appellate Procedure is the only location in rule or statute in which remittitur is taken up. The text of this rule does not explain the purposes for remittitur; rather it focuses exclusively on the timing and conditions of its issuance. While we have never had the occasion to set out a comprehensive explanation of the purpose and scope of remittitur, our more recent cases in which remittitur plays a role suggest that insofar as remittitur has jurisdictional implications, its primary effect is to provide a clear indication that the trial court has regained jurisdiction to take action consistent with the mandate. *Chase Manhattan Bank v. Principal Funding Corp.*, 2004 UT 9, ¶ 9, 89 P.3d 109.

¶ 14 In contrast, the State emphasizes the effect of remittitur on appellate court juris-diction, citing language from *Miller v. Southern Pacific Co.*, 82 Utah 307, 24 P.2d 380 (1933), that remittitur may be withdrawn only upon a "showing that the remittitur was issued through fraud or inadvertence or was issued prematurely or otherwise improperly." *Id.* at 381.

¶ 15 Relying on the authority of *Miller*, the State contends that, regardless of the existence of a jurisdictional justification and a procedure to invoke it, the court of appeals lacks jurisdiction because it issued its remittitur following Mr. Lara's voluntary withdrawal of his appeal. Thus, according to the State, by issuing its remittitur the court of appeals erected a barrier to its jurisdiction so imposing that it cannot be surmounted even by jurisdiction with a constitutional pedigree.

¶ 16 The State's jurisdictional reasoning is anchored in its assertion that the act of issuing a remittitur has profound jurisdictional consequences. Once remittitur occurs, whatever jurisdiction remains vests in the court to which the remittitur is directed. The appellate court is left with no jurisdiction. While this overstates the State's argument to the extent that even the State presumably would concede that the appellate court retains the jurisdiction necessary to compel compliance with the terms of the remittitur, the unmistakable theme of the State's position is the mistaken notion that jurisdiction is a zero sum game—that the acquisition of jurisdiction by one court must be matched by a jurisdictional loss by another. This point of view held sway with Judge Bench, who in his *Lara* dissent stated that the court of appeals' "remittitur ended our jurisdiction over any appeal relating to the bind-over." *State v. Lara*, 2003 UT App 318, ¶ 41, 79 P.3d 951.

¶ 17 Without jurisdiction, the court of appeals had, according to the State and the court of appeals dissent, no authority to reinstate Mr. Lara's appeal. The only way the court of appeals could regain jurisdiction was to recall its remittitur. This course of action was, according to Judge Bench, unavailable because of the "bedrock principle" that the authority to recall remittiturs is "extremely limited." The State and the *Lara* dissent

join in their reasoning that with its jurisdiction lost and the only recognized method to reestablish it foreclosed, the court of appeals had no legitimate basis to revive Mr. Lara's appeal. This is a view that does not stand up to close examination.

¶ 18 Our cases do not lend support to the State's binary, all or nothing, understanding of appellate jurisdiction. We have held that trial courts retain limited jurisdiction after a notice of appeal has been filed. *White v. State*, 795 P.2d 648, 650 (Utah 1990). In our view, the very concept of all or nothing jurisdiction is flawed.

█ ¶ 19 The narrow reading of the traditionally recognized grounds for recalling a remittitur and the reluctance by courts to apply them can be traced to the desire to discourage parties disappointed with the outcome of appeals from mounting attempts to undo a result long after a decision is handed down. Thus, as the State correctly notes, an appellate court is without power to recall a mandate "for the purpose of reexamining the cause on the merits, or to correct judicial error." 5 C.J.S. *Appeal and Error* § 1012 (2005). We do not take issue with this statement of law. Indeed, a concern fundamental to our decisions in cases in which a defendant appeals after being barred from walking into the appellate court's front door is the fear that by penetrating the court's walls with too many side and back doors we may compromise the finality so essential to the integrity of the judicial process and lead appellate courts to overstep their jurisdiction. The remedy that we set out in this opinion is fashioned by giving due consideration to the risks that would accompany a broad invitation to challenge the voluntariness of motions to withdraw appeals. We believe, however, that despite the importance our rules play in the regulation and management of the appellate courts, they cannot be interpreted in a manner that would stymie a legitimate quest to assert important constitutional guarantees.

█ ¶ 20 In fact, we find in article VIII, section 5 important additional constitutional support supplementing the right to appeal guaranteed by article I, section 12, which nullifies the proposition that the issuance of a remittitur is an impenetrable barrier to the reacquisition of appellate jurisdiction. This section, which is entitled "Jurisdiction of district court and other courts—right to appeal" provides that "there shall be in all cases an appeal of right from the court of original jurisdiction to a court with appellate jurisdiction over the cause."

¶ 21 We read this constitutional language as an express grant of appellate jurisdiction that provides procedural context to and reinforces the substantive importance of the guarantee of the right of appeal extended to criminal defendants. These twin constitutional affirmations of the right to appeal are independent of and override, in our view, whatever jurisdictional significance might reside within rule 36 and jurisprudence relating to remittiturs. Article I, section 12's guarantee of the right of criminal defendants to appeal occupies a place within the Constitution's Declaration of Rights, the repository of our citizens' most prized liberties. However, such a right, no matter how sacrosanct, is of little worth without a procedure to protect it. Article I, section 12, in concert with article VIII, section 5, provides a unique connection between the article I guarantee of the right to appeal and an express grant of jurisdiction to give practical effect to that right.

¶ 22 Having determined that, as a result of the primacy of the constitutional guarantee to an appeal, the issuance of a remittitur does not foreclose an appellate court from reasserting jurisdiction over a dismissed appeal, we turn to the question of how to properly assess what constitutes an article I, section 12 violation which an appellate court can address through the jurisdiction provided by article VIII, section 5. Over time we have considered numerous appeals brought by criminal defendants who ask us to reopen the door to our appellate courts. These cases contain several common elements. First, they uniformly concern challenges to a claim that a defendant has waived his right to appeal. Next, almost without exception, defendants contest the claims of waiver by contending that the alleged waivers were not knowing and voluntary and that, therefore, the defendants were denied their right to appeal guaranteed by article I, section 12 of the Utah Constitution. *Manning v. State,*

2005 UT 61, 122 P.3d 628; *State v. Tuttle,* 713 P.2d 703, 704 (Utah 1985).

¶ 23 Our recently decided case, *Manning,* illustrates the difficulties and complications that accompany the task of matching jurisdictional rationale to workable procedure where appellate jurisdiction appears to have been forfeited. There, we took up the question of how a defendant who had entered an unconditional guilty plea and in so doing surrendered his right to appeal could go about pursuing his claim that the apparent waiver of his right to appeal was not knowing or voluntary, thereby violating article I, section 12.

■ ¶ 24 Our opinion traversed terrain stretching from the common law writ of coram nobis, through *State v. Johnson,* 635 P.2d 36 (Utah 1981), where we created the procedural sleight of hand known as nunc pro tunc resentencing, across multiple amendments to rule 65B, on into the realm of the Post Conviction Relief Act, before alighting on a new remedy for restoring a denied criminal appeal. The *Manning* remedy provides that the time for filing an appeal may be reinstated to a defendant who carries the burden of proving "that he has been unconstitutionally deprived, through no fault of his own, of his right to appeal." *Manning,* 2005 UT 61, ¶ 31. *Manning* also provides three non-exclusive examples of how its standard could be met. *Id.*

¶ 25 Inevitably, the *Manning* examples are rooted in circumstances that call into question the voluntariness of the defendant's alleged waiver of his right to appeal: the attorney's failure to act on a commitment to file an appeal, a failure to advise a defendant of his right to appeal, and the defendant's diligent, blameless, but futile attempt to exercise his right to appeal.

¶ 26 One of the lessons of *Manning* is that virtually every claim of a denial of the right to appeal arises from the forfeiture of the right to appeal by waiver countered by a claim that the waiver was not voluntary. This characteristic appears no less frequently in settings where, as here, a perfected appeal has been dismissed after being withdrawn than under circumstances where an appeal is never filed. Both confront us with the same task of creating a method to test the merits of a claim that a dismissed appeal was based on an unknowing or involuntary withdrawal of the appeal that is practical, effective, and within the bounds of our jurisdiction. Because our approach to the dilemma of how to adequately protect the constitutional right to appeal while preserving the integrity of the appellate process is derived from our prior cases confronting this question, we will review those cases before returning to set out the methods and standards to guide appellate courts that confront applications to revive appeals.

■ ¶ 27 We have previously departed from a strict application of the *Miller* remittitur recall standards in *Tuttle. Tuttle* followed the pattern of claimed involuntariness common to cases in which a defendant challenges the dismissal of his appeal. There, we ordered the reinstatement of a prison escapee's appeal after we had dismissed it.[1] 713 P.2d at 704. We did not indicate in our opinion whether we had issued a remittitur of Mr. Tuttle's dismissal. Since under the appellate rules then in effect a remittitur issued fifteen days after the dismissal, it is more likely than not that it had issued and we did not consider its issuance to be an impediment to the constitutional reasoning that underlay our holding, for the reasons articulated in this opinion. In *Tuttle* we exercised jurisdiction granted to appellate courts by the Utah Constitution to make real the right of appeal. We determined that an escape cannot result in a conclusive assumption that the escapee has made an affirmative decision to waive his constitutional right to appeal. *Id.* It is difficult for us to imagine that the injection of the issuance of a remittitur as a potential issue in *Tuttle* would have altered either the analysis or the result. *Tuttle* stands for the high degree of importance we afford the guarantee of the constitutional right to appeal. We stated then, and we reaffirm today, that we

---

1. We dismissed the appeal based on the presumption that escape constituted a voluntary waiver of the right to appeal. This ruling was consistent with previous holdings, such as *Hardy v. Morris,* 636 P.2d 473 (Utah 1981), that were overruled by this court's decision in *Tuttle.*

will carefully protect the right to appeal guaranteed by article I, section 12.

¶ 28 The obvious question stemming from *Tuttle*, therefore, is what precisely constitutes a voluntary and, consequently, binding waiver of one's right to appeal. This question was partially answered in *State v. Houskeeper*, 2002 UT 118, 62 P.3d 444. Mr. Houskeeper, a minor, was charged in juvenile court with aggravated sexual assault and forcible sodomy. *Id.* ¶ 1. As here, the case was bound over to the district court under the SYOA. *Id.* Mr. Houskeeper appealed the bindover to the court of appeals, but later filed a motion to voluntarily dismiss the appeal, which was granted. *Id.* ¶ 3. The district court eventually convicted Mr. Houskeeper, and he appealed. *Id.* ¶ 9. As part of that appeal, he claimed that the juvenile court erred in its bindover decision. *Id.* ¶ 23. We refused to allow his appeal because the Utah Rules of Appellate Procedure require such an appeal to be filed within thirty days. *Id.*

¶ 29 Neither our reaffirmation of the principles that form the underpinnings of *Tuttle*, nor our rejection of the assertion that the appellate court is wholly divested of jurisdiction upon the issuance of a remittitur, answers without fuller explanation how our determination that the court of appeals properly reinstated Mr. Lara's appeal can coexist with our decision in *Houskeeper*.

¶ 30 The similarities between *Houskeeper* and this case are great and acknowledged in both the majority and dissenting court of appeals opinions. However, the determinative factor in *Houskeeper* is not the motion to withdraw the appeal or the running of the period for appeal; instead, it is the fact that these indices of waiver were unaccompanied by evidence of involuntariness. The interests of finality demand that there be certain instances where an inference of voluntariness arises. These include allowing a statutorily established time for appeal to run or a motion for voluntary withdrawal of an appeal. The absence of such presumptions would unduly and likely unlawfully expand appellate jurisdiction beyond the bounds granted to appellate courts by our Constitution and statute. However, we cannot permit our juris-

dictional reach to fall short of grasping claims of a denial of the right to appeal based, as here, on a meritorious assertion of involuntariness.

¶ 31 As our discussion of *Manning* and the considerations relevant to evaluating justifications for reviving the opportunity to file a time-lapsed appeal made clear, the issue of voluntary waiver is present in some form in every application for access to appellate review otherwise barred on jurisdictional grounds. *Houskeeper* is no exception. Absent any apparent articulation of a reason why Mr. Houskeeper's withdrawal of his appeal was involuntary, our affirmance of Mr. Houskeeper's waiver of his right to appeal was unremarkable. By contrast, whether Mr. Lara's withdrawal of his right to appeal the bindover was voluntary in light of the representations made by the trial judge is at the center of the controversy before this court.

¶ 32 Remaining to be answered is the question of how and where the merits of a claim of involuntary waiver should be evaluated. In *Manning* we held that a defendant may reset the appeal clock if he can prove that the circumstances of his waiver of appeal constituted an unconstitutional denial of his right to appeal. This proof was to be presented to the trial court "based on facts in the record or determined through additional evidentiary hearings." *Manning*, 2005 UT 61, ¶ 31. The trial or sentencing court was the forum in which the *Manning* inquiry was to occur. Of course, the option to conduct additional evidentiary hearings can be easily exercised in trial courts. This is not the case in appellate courts.

¶ 33 In *Tuttle, Houskeeper*, and the court of appeals opinion here, the assessment of the voluntariness of the waiver of the right to appeal was based exclusively on the contents of the record. We express no opinion concerning the issue of whether circumstances might arise in which the consideration of additional evidence might be warranted in the context of assessing the voluntariness of a withdrawn appeal, other than to note the obvious difficulties associated with the selection of forum where such evidence may be received and assessed.

## CONCLUSION

¶ 34 The court of appeals acted properly when it reinstated Mr. Lara's appeal. The Utah Constitution provides appellate courts with the jurisdiction to protect criminal defendants' right to appeal. Because Mr. Lara's waiver of his right to appeal was involuntary, denying his request for reinstatement of that right would constitute a violation of article I, section 12, so the court of appeals was obligated to act within its jurisdiction and provide Mr. Lara with an appeal. Accordingly, we affirm the court of appeals.

¶ 35 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.